1
2
3
4 **UNITED STATES DISTRICT COURT**
5 **DISTRICT OF NEVADA**
6
7  WILHELMINA E. HOWARD,                    )
8                              Plaintiff,   )      Case No. 2:14-cv-01211-GMN-GWF
                                            )
9  vs.                                      )      **REPORT AND**
                                            )      **RECOMMENDATION**
10 CAROLYN W. COLVIN,                       )
   Commissioner of Social Security,        )
11                                          )      Motion for Reversal and/or Remand (#16)
                             Defendant.     )      Cross-Motion to Affirm (#17)
12 _____ )

13        This case involves judicial review of administrative action by the Commissioner of Social

14 Security denying Plaintiff Wilhelmina Howard's claim for disability benefits under Title II of the Social

15 Security Act.  Plaintiff's Complaint (#4) was filed August 22, 2014.  Defendant's Answer (#12) was

16 filed November 3, 2014, as was a certified copy of the Administrative Record (the "AR").  (*See* #13)

17 This matter has been submitted to the undersigned United States Magistrate Judge for Findings and

18 Recommendations on Plaintiff's Motion for Reversal and/or Remand (#16), filed on December 3, 2014,

19 the Commissioner's Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal and/or

20 Remand (#17), filed on January 2, 2015, and Plaintiff's Reply (#19) filed on January 21, 2015.

21                                        **BACKGROUND**

22        **A.      Procedural History.**

23        On November 18, 2010, Plaintiff filed a Title II application for a period of disability and

24 disability insurance benefits, alleging that her disability began on December 1, 2009.  AR 17.  The

25 Social Security Administration denied Plaintiff's claim on May 6, 2011.  AR 68.  Plaintiff then filed for

26 reconsideration, which was denied on November 16, 2011.  AR 79.  Plaintiff requested a hearing before

27 an Administrative Law Judge ("ALJ") and testified at a hearing before the ALJ on November 28,

28 2012.  AR 31-45.  Vocational Expert Robert Preston also testified at the hearing.  AR 45-53.  The ALJ

determined that Plaintiff was not disabled from December 1, 2009 through December 21, 2012.  AR 17-26.  Plaintiff appealed the decision of the ALJ to the Appeals Council on February 14, 2013.  AR 12.  The Appeals Council denied Plaintiff's request for review on April 25, 2014.  AR 1-5.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

**B.     Factual Background.**

Plaintiff Wilhelmina Howard was born January 22, 1951.  AR 148.  She is 5'4" tall and weighed 198 pounds in October 2011.  AR 324.  Plaintiff obtained her General Education Diploma in 1989.  AR 149.  At the time of the hearing, Plaintiff had resided alone for about a year.  Prior to that, Plaintiff resided with her daughter and son-in-law.  AR 35.

**1.     Plaintiff's Disability/Work History Reports and Hearing Testimony**

In her initial November 2010 disability report, Plaintiff listed fibromyalgia as her disabling condition.  AR 148.  Plaintiff stated that she stopped working on October 12, 2008 because of her fibromyalgia and because she had missed too many days of work due to a cyst formation.  AR 148.  Plaintiff reported that in 2009 she held jobs as an accounting trainee, an electronics assembler, and cared for the elderly.  AR 149.  She was currently taking Gabapentin to help her sleep and with her pain.  AR 151.  She had treated at Chappa De Clinic from 2003 through 2006.  The doctor at Chappa De Clinic first diagnosed Plaintiff with fibromyalgia.  AR 151.  She was treated for her fibromyalgia at the Paiute Clinic from 2006 through 2010 and had seen Dr. Nicole Davey with UMC Lied Clinic from March 2010 through December 2010.  AR 152.

Plaintiff submitted a second disability report in June 2011.  AR 175-185.  Plaintiff stated that since her prior report her pain level increased, she would get tired more often, her symptoms of depression increased, her muscles got fatigued more quickly, and she experienced "knots" in her muscles.  AR 176-177.  She stated that since her initial report she had continued to treat with Dr. Davey who proscribed Lyrica for her fibromyalgia.  AR 179.  Dr. Davey also provided Plaintiff with information on a therapist to help with her depression.  AR 177.  Plaintiff noted that she had a session scheduled with a therapist to help address her depression.  AR 178.  Plaintiff filed a third disability report in November 2011.  Plaintiff reported that there had been no change since her June 2011 disability report.  AR 196-200.

1   In July 2011, Plaintiff submitted a function report.  AR 186-193.  Plaintiff stated that her pain

2   level was continuously increasing and that her fibromyalgia had caused her to go into a depression.  AR

3   186.  She always went to sleep in pain and woke up from sleep in pain.  AR 187.  She stated that she

4   could still take care of her animals.  AR 187.  At the time of the function report, Plaintiff was living

5   with her daughter and son-in-law who usually prepared her meals.  AR 188.  The only chores she could

6   do were the laundry, a little ironing, and a little cleaning.  She was unable to do any outside chores.  AR

7   188.  Plaintiff noted that she hardly went outside and enjoyed "any and all crafts, TV, [and] reading

8   Bible."  AR189-190.  Her social activities consisted of going to church, doctor appointments, and

9   sometimes visiting with friends.  AR 190.  She had problems getting along with family but could not

10  explain why.  Since her depression she did not want to be around people.  AR 191-192.  Plaintiff stated

11  that she was currently taking Lyrica and Cymbalta.  AR 193.

12  Plaintiff testified at a hearing before ALJ David Gatto on November 28, 2012.  AR 31-53.  She

13  stated that she could not work due to "[e]xtreme exhaustion and the pain throughout [her] body."  She

14  also had a hard time concentrating and had bouts of crying.  AR 35.  She testified that she had lived by

15  herself for about a year and prior to that she lived with her daughter and son-in-law.  Her typical day

16  consisted of cleaning up a bit, resting, and crafting.  She took care of all the cooking, cleaning, and

17  shopping.  AR 35.  Her friend would take her shopping and help with other chores around the house,

18  such as the dishes and vacuuming.  AR 36.  The heaviest item she could lift was a gallon of milk and,

19  she oftentimes used a shopping cart as a walker.  AR 36.

20  Plaintiff testified that she would not be able to spend two hours on her feet without needing to

21  sit down.  AR 36.  Her last job was assembling items and that the job ended because she "was sick all

22  the time."  AR 37.  She had a driver's license but did not have a car.  A friend would usually take her

23  where she needed to go.  Her medication caused her to go to sleep and wake up "all fuzzy" and it made

24  her sweaty, irritated, and agitated.  AR 37.  She had tried several different medications because some

25  "sent [her] into really bad depressions" and "made [her] want to sleep all day long."  AR 38.  Her

26  current medications do "take the edge off."  AR 45.  Plaintiff explained that she benefitted from

27  physical therapy when she could go.  AR 45.  She discontinued therapy because the commute was an

28  hour long and very uncomfortable.  AR 45.

Plaintiff testified that the fibromyalgia caused pain all over her body for the past five to six years and fatigue for the past nine years. AR 38; AR 41. The pain is "aching all over [her] body but there's some parts where it's, the pain is extreme, like in [her] hands and [her] knees and [her] hip. And sometimes its feels like [she is] being stabbed with a dull fork." AR 39. Her pain level and fatigue were getting worse. If she was active on a particular day, her pain level would be at a ten. AR 39. She would only be able to do an activity for about 45 minutes before needing to take a break due to the fatigue and pain. AR 40. Plaintiff enjoyed crafting but could only work on her crafts for about a half hour before her muscles began to hurt. AR 42. She needed to take a sleeping pill to sleep. AR 41. On a typical day, her fatigue level would be about a six out of ten. She would lay down for about four to five hours during an eight hour day. AR 41. In an eight hour work day she could only sit for about 30 to 45 minutes before she would need to get up. She could sit for approximately 3 to 4 hours total a day. AR 43-44. She would only be able to stand for 20 to 25 minutes at a time during an eight hour work day, and could only stand for a total of 4 to 5 hours total that day. Plaintiff also stated that she could walk for about 30 to 45 minutes at one time prior to having to get off of her feet. AR 44.

Plaintiff testified that her depression was a factor in why she was unable to continue working. AR 41. Her depression would cause her to cry a lot, lose concentration, and feel guilty and worthless. She had previously attempted suicide on multiple occasions, the last being about ten years prior. AR 42-43. Plaintiff stated that she "[doesn't] like to be around people" because "they hurt [her]." AR 43.

Plaintiff testified that she suffers from a left thumb trigger finger. Her left thumb would snap down and cause her severe pain. She would have to use the other hand to straighten it out. AR 44. She needed to have an operation or steroid shots to alleviate the problem, but she could not afford it. Plaintiff stated that she tries to avoid using her left thumb so that it will get better. AR 44.

### 2.     Vocational Expert's Testimony

Vocational Expert ("VE") Robert Preston testified at the November 28, 2012 hearing. After establishing Plaintiff's prior history as an electronic assembler/tester (light work), inspector (sedentary work), administrative assistant (sedentary work), and day care worker (light work), AR 49, the ALJ asked the VE the following hypothetical question:

. . .

> Let's assume we had a hypothetical woman who was – well, a person of advanced age with at least a high school education and a history of fibromyalgia syndrome, obesity. And if we were to assume these impairments would limit that hypothetical woman to work at the light exertional level as defined by the <u>DOT</u> and the regulations with climbing of stairs or ramps limited to frequent, occasional climbing of ladders, ropes or scaffolds. Frequent balancing, stooping, kneeling. Occasional crouching, occasional crawling. Well, with those limitations, would that hypothetical woman be able to do any of the claimant's past work?

AR 50.

The VE responded that the person would be able to work as an electronic tester and inspector. AR 50. The ALJ then asked whether these jobs would still be available if the hypothetical woman was limited to frequent handling and fingering on the left. AR 50. The VE testified that both positions would be affected because that job requires work at a constant level and requires the use of both hands. AR 50-51. When asked whether there would be any transferable skills, the VE testified that there are no transferable skills at the sedentary level. AR 51. Plaintiff's counsel asked whether the hypothetical person would be able to perform any past relevant work based on the following limitations:

> [T]he ability to sit at one time for an hour, a total of two hours throughout an eight-hour day.
>
> . . .
>
> Stand for 40 minutes at one time, two hours total throughout an eight-hour day. Walk for 40 minutes at a time, two hours total throughout an eight-hour day.

AR 51.

The VE responded that the person would not be able to perform past relevant or competitive work at the sedentary level. AR 52. Plaintiff's counsel inquired whether a person who missed work 50% of the time due to medical conditions would be able to obtain employment. AR 52. The VE explained that the person would not be able to obtain work as no employer would allow an employee to miss half the work days in a month. AR 52. Plaintiff's counsel asked whether the hypothetical person would be able to perform any type of competitive employment if she was required to lay down for about four to five hours during a typical work day. AR 52. The VE responded that no employment would be possible because "no employer is going to allow you to lay down on the job unless an accommodation was made." AR 52.

### 3.    Medical Records and Reports

Plaintiff's medical records show that she had a long history of fibromyalgia.[1]  Plaintiff treated at the Las Vegas Paiute Tribe Health and Human Services ("LVPHHS") from February 2007 to June 2010.  AR 226-246.  She presented to LVPHHS with complaints of general body malaise consistent with a diagnosis of fibromyalgia.  AR 226-246.  During that time, Plaintiff was prescribed Savella, Tramadol, Gabapentin, and Lyrica to address her fibromyalgia.  AR 223-237.  Plaintiff was also instructed to exercise and consider weight loss to help with her symptoms.  AR 228-229, 233-237.  Plaintiff was noted to have improved symptoms of her fibromyalgia during a follow-up visit on January 29, 2010.  AR 233.  At her last visit, on June 3, 2010,  Plaintiff was instructed to follow-up with a doctor at University Medical Center ("UMC").  AR 226.

Plaintiff was seen at UMC for her fibromyalgia beginning on June 2, 2010.  From June 2, 2010 through November 17, 2010, there were no significant changes in treatment or findings.  AR 279-285.  On November 17, 2010 Nicole Davey M.D. filled out a Medical Provider Assessment form, in which she stated that Plaintiff suffered from fibromyalgia and that her prognosis was fair.  AR 273.  Plaintiff's treatment plan included a prescription for Gabapentin and physical and occupational therapy.  Dr. Davey noted that Plaintiff had limitations on work activities in that she could not do strenuous physical activity.  These limitations were indefinite.  AR 273.

Plaintiff was seen by Dr. Davey on December 29, 2010 for fatigue and overall body pain.  Plaintiff stated that her fibromyalgia symptoms, including fatigue and chronic pain, had worsened since the change in the weather.  AR 409.  Dr. Davey found that Plaintiff had a diamond distribution tenderness to palpation in her back and diagnosed her with fibromyalgia and dyspepsia.  Plaintiff's Gabapentin dosage was increased and Dr. Davey encouraged her to lose weight to help with some of the symptoms.  AR 409.  Plaintiff stated that she felt an improvement in her symptoms when she lost weight.  At that time, Plaintiff did not want to start back on Lyrica.  AR 409.

On March 2, 2011 Plaintiff presented to Dr. Davey for pain and fatigue.  AR 405.  Plaintiff

---

[1] While Plaintiff asserted that her disability began as of December 1, 2009, a PCC Ambulatory Encounter Record from the Las Vegas Paiute Health and Human Services dated February 8, 2007 noted that Plaintiff had a history of fibromyalgia.  AR 246.

stated that she noticed chronic blurring of her vision and occasional nystagmus.  She had also been increasing her Gabapentin dose as her pain increased.  AR 405.  Dr. Davey found that Plaintiff had point tenderness in a diamond distribution on her back as well as her pretibial area.  Dr. Davey prescribed Lyrica in the place of Gabapentin.  Plaintiff was also referred to physical and occupational therapy and was told that if her depression symptoms changed she was to be evaluated by a psychiatrist. AR 405.

Plaintiff was seen by Dr. Davey on March 30, 2011 for complaints of body aches.  Plaintiff stated that "since being changed to Lyrica she has had increasing diffuse myalgias and arthralgias and has had fatigue as well."  AR 402.  Dr. Davey found that Plaintiff had point tenderness in her pretibial, brachiocephalic, and in her back muscles.  Plaintiff also had insomnia.  AR 402.  Dr. Davey noted that Plaintiff was compliant with physical and occupational therapy and was to continue both.  Plaintiff's Lyrica dosage was increased and she was prescribed Ambien to help her sleep.  AR 402.

Dr. Davey saw Plaintiff on May 11, 2011 for complaints of generalized body pain.  AR 315. Plaintiff reported that since her last visit she had a very mild improvement of her symptoms and stated that her physical and occupational therapy had been helping her.  Plaintiff stated that she would have some good days but more bad days where she would have difficulty lifting her arms and head.  AR 315. Upon physical examination, Dr. Davey stated that Plaintiff "[did] have point tenderness in diamond distribution in her back, as well as point tenderness and trigger tenderness consistent with fibromyalgia."  AR 315.  Dr. Davey prescribed an increase in Plaintiff's Lyrica prescription.

On June 13, 2011, Plaintiff was seen by Weiming David Chu, M.D. at UMC for an initial intake evaluation for depression.  AR 312.  Plaintiff stated that she was depressed, but denied any suicidal/homicidal attempt or ideation.  AR 313.  Dr. Chu diagnosed Plaintiff with major depressive disorder, which was recurrent and moderate.  Due to Plaintiff's fibromyalgia, she was prescribed Cymbalta and Titrate.  AR 313.

On July 20, 2011 Plaintiff was seen by Kartika Shetty, M.D. at UMC for follow-up on her fibromyalgia and depression.  AR 392.  Plaintiff stated that since her last visit she had difficulty crocheting and performing fine motor tasks.  She stated that she became very fatigued after a short period of activity and felt as if she was in "global pain most of the time."  AR 392.  Plaintiff reported

7

moderate benefit in using Lyrica and was taking Cymbalta for her depression.  Dr. Shetty found that Plaintiff had point tenderness in multiple locations.  AR 392.  Dr. Shetty stated that Plaintiff's "clinical condition, clinical symptoms as well as negative serological evidence is consistent with fibromyalgia."  AR 393.  Plaintiff was to continue taking Lyrica and Cymbalta and was to complete occupational and physical therapy as well as low-impact exercise to address all symptoms.  AR 393.

Plaintiff was seen by Vincent Ho, D.O. for depressive disorder on August 8, 2011.  AR 425-426.  Plaintiff stated that since her previous visit she had discontinued taking her medication because she experienced excessive perspiration when she took the medication.  AR 425.  Dr. Ho diagnosed Plaintiff with major depressive disorder, that was moderate without psychotic features.  AR 425.  Plaintiff was to discontinue taking Cymbalta and was prescribed Mirtazapine to address her depression.  AR 426.

Plaintiff was seen at UMC for her complaints of generalized body pain on August 22, 2011.  AR 388.  Plaintiff stated that she was having generalized body aches at a level of five (5) on a ten (10) point scale.  Her symptoms decreased with rest and were minimally relieved with Lyrica.  AR 388.  Plaintiff was advised to continue Lyrica and Mirtazapine and was to follow-up with a psychiatrist.

On October 17, 2011 Plaintiff presented to Nischala Nannapaneni, M.D. at UMC for a follow-up regarding her complaints of generalized body pain.  AR 384.  Plaintiff complained that the pain was an eight (8) on a ten (10) point scale.  She stated that Lyrica helped her a little bit.  AR 384.  Dr. Nannapaneni performed a check of the twenty (20) points of tenderness for fibromyalgia and found that more than nine (9) of them were positive.  AR 385.  Plaintiff was advised to continue Lyrica and was started on Savella to help address the body ache and pain due to the fibromyalgia since Cymbalta and Gabapentin were ineffective.  Plaintiff was also advised to follow-up with a psychiatrist to address her depression.  AR 385.  Plaintiff refused to get a mammogram, Pap smear, and colonoscopy because she could not afford it.  AR 385.

Plaintiff presented to Cynthia Herrick, M.D. at UMC on November 28, 2011 for complaints of generalized body pain with occasional numbness of her upper and lower extremities.  AR 380.  Plaintiff stated that her symptoms are "well-controlled with Lyrica and Savella."  AR 380.  Plaintiff also stated that she was taking Mirtazapine for her depression and otherwise had no new complaints or symptoms.

Dr. Herrick found that Plaintiff had multiple tender points and diagnosed Plaintiff with fibromyalgia. AR 380.  Plaintiff was to continue taking Lyrica and Savella.  Plaintiff was advised to get a mammogram and Pap smear done, but again declined because she could not afford it.  AR 380-381.

On February 13, 2012, Plaintiff was seen by Dr. Herrick for a follow-up visit.  She complained of worsening generalized body aches, fatigue, and difficulty in falling asleep.  AR 376.  Dr. Herrick found that "on palpation there is wide spread bilateral symmetrical tender points over numerous muscle groups." AR 376.  She also found that Plaintiff "looks depressed."  AR 376.  Plaintiff was diagnosed with fibromyalgia, major depressive disorder, intermittent shakiness, hypertriglyceridemia, and obesity. AR 377.  Plaintiff's dosage of Savella was increased and she was to continue taking Lyrica.  Plaintiff did not want to take medication for her depression and was advised to lose weight to address some of her health problems.  AR 377.

Plaintiff presented to Nirmal Sunkara, M.D. at UMC on April 5, 2012 for a medication refill and a follow-up regarding her generalized body aches.  AR 372.  Plaintiff noted that her pain increased with activity and decreased with rest.  Her pain level and its frequency had not changed since her last visit. AR 372.  Plaintiff was supposed to see a pain management doctor the month prior but failed to go because she was "afraid of taking opiods."  AR 372.  Plaintiff noted that her depression was secondary to her fibromyalgia.  Dr. Sunkara found that Plaintiff had typical tender points over numerous muscle groups and diagnosed Plaintiff with fibromyalgia, depression, and dyslipidemia.  AR 372-373.  Plaintiff was started on Tramadol for her fibromyalgia in addition to Lyrica.  Plaintiff was also advised to continue Savella and counseled on benefits of weight loss.  AR 373.

On August 20, 2012 Plaintiff presented to Mahendran Jayaraj, M.D. at UMC for a follow-up as well as complaining of generalized joint pain and left thumb pain.  AR 365.  Plaintiff stated that her pain was getting worse day-by-day, but noticed that her pain decreased when she rested.  Plaintiff stated that Tramadol helped with her pain, but still required an increased dose because after four (4) hours she was in severe pain.  AR 365.  Dr. Jayaraj found that Plaintiff had multiple tender points in large muscle groups.  AR 366.  Dr. Jayaraj diagnosed Plaintiff with fibromyalgia, a left thumb trigger finger, dyslipidemia, depression, and obesity.  AR 366.  Dr. Jayaraj increased the frequency of Plaintiff's Tramadol but did not increase the dosage.  Plaintiff was given a rheumatology referral.  AR 366.  She

1    was also advised to continue using a brace to help with her left trigger thumb and was given a surgery

2    referral.  Plaintiff was also advised that she needed to lose weight, and that exercise and dietary

3    modifications would help.  AR 366.  Plaintiff noted that she could not afford a colonoscopy or

4    mammogram.  Plaintiff's medications included Lyrica, Savella, Ambien, and Tramadol.  AR 366-367.

5        On October 15, 2012 Plaintiff was seen by Dr. Shetty at UMC for a follow-up regarding her

6    complaints of generalized body pain.  AR 360.  Plaintiff's symptoms were slightly improved with the

7    increased dose and frequency of Lyrica but the recent onset of cold weather had worsened her

8    symptoms.  Dr. Shetty found that Plaintiff had typical tender points for fibromyalgia and had pain in her

9    left thumb whenever she flexed it.  AR 360.  All other symptoms were normal.  Plaintiff was to

10   continue taking the maximum doses of Savella and Lyrica and the plan was to increase the dose of

11   Tramadol.  Plaintiff was also taking Zolpdim to help with her insomnia.  AR 361.  Plaintiff was given a

12   referral to a rheumatologist to address her fibromyalgia and trigger finger.  Dr. Shetty also advised

13   Plaintiff about the need for weight loss and referred her to a psychiatrist to address her depression.  AR

14   361.

15       Dr. Davey completed a Residual Functional Capacity form for Plaintiff on July 20, 2011.  She

16   found that Plaintiff could sit for one (1) hour at a time and could sit for a total of two (2) hours in a day.

17   AR 319.  Plaintiff could stand for forty (40) minutes at a time and for a total of two (2) hours in a day.

18   She could also walk for forty (40) minutes at a time, for a total of two (2) hours in a day.  AR 319.

19   Plaintiff could very seldomly lift or carry ten (10) to fifty (50) pounds and could seldomly kneel and

20   crawl.  Plaintiff could occasionally lift or carry zero (0) to ten (10) pounds and could occasionally climb

21   stairs, bend, stoop, or crouch.  AR 319.  When asked if Plaintiff could use her hand every day for up to

22   two and a half (2 1/2) hours out of an eight (8) hour work day, Dr. Davey stated that "At this time her

23   symptoms do not permit this much activity."  AR 319.  Dr. Davey found that Plaintiff was capable of

24   using her hands to grasp, push/pull, and for fine manipulations "for a limited amount of time less than

25   <1 hour per day."  AR 320.  Plaintiff was also capable of occasionally using her feet for repetitive

26   operation of foot controls.  Dr. Davey indicated that Plaintiff could not be around unprotected heights,

27   and could moderately be around moving machinery, be exposed to marked changes in temperature and

28   humidity, and be exposed to dust, fumes, and gases.  AR 320.  Dr. Davey found that Plaintiff's pain

1    level was moderately severe, her pain caused frequent fatigue, and she was unable to deal with stress

2    due to her condition.  Plaintiff could frequently maintain attention, concentration, persistence, and pace

3    in performing daily tasks during an average work day.  AR 320.  Plaintiff's medications caused nausea

4    and drowsiness.  AR 321.  Dr. Davey found that Plaintiff would miss about 50% of work due to her

5    fibromyalgia and her condition would require her to alternate between sitting and standing positions

6    every fifteen (15) minutes.  Plaintiff would need to take a fifteen (15) minute break ever hour during an

7    average work day.  AR 321.  Overall, Dr. Davey found that Plaintiff met the 1990 American College of

8    Rheumatology (ACR) criteria for the diagnosis of fibromyalgia and specifically noted that Plaintiff "has

9    clinical evidence of fibromyalgia that inhibits her ability to work at strenuous job."  AR 321.

10          At the request of the Bureau of Disability Adjudication, Plaintiff was examined by Dr.

11   Wencesloa A. Cabaluna on April 27, 2011.  Plaintiff complained of generalized body and joint pain that

12   had been present for the past 12 to 15 years.  AR 296.  Dr. Cabaluna noted that Plaintiff was able to

13   "walk a couple blocks, [and] has no problem sitting down or standing for at least a half an hour."  AR

14   296.  Plaintiff denied using illicit drugs in the past and noted that she was currently prescribed Lyrica.

15   AR 297.  Dr. Cabaluna noted that Plaintiff had a normail gait, she had a hand grasp of 5/5 on both

16   hands, with 5 being strong, and she could perform various tasks with her hands with no difficulty.  AR

17   299.  On examination, Dr. Cabaluna found that Plaintiff had 6 positive tender points for fibromyalgia.

18   AR 303.  Plaintiff's ability to squat and rise declined during the examination, and Dr. Cabaluna noted

19   that it may have caused pain on Plaintiff's knees.  Plaintiff did not need the assistance of a cane or other

20   device.  AR 299.  The remainder of Plaintiff's exam was unremarkable.  AR 300.  Dr. Cabaluna

21   concluded that Plaintiff's memory and ability to concentrate were intact and that she was able to

22   understand and follow instructions well.  AR 300.

23          Dr. Cabaluna found that Plaintiff could occasionally lift and/or carry fifty (50) pounds and

24   frequently lift and/or carry twenty-five (25) pounds.  AR 304.  He stated that Plaintiff could stand

25   and/or walk for about six (6) hours in an eight (8) hour workday and that she did not need an assistive

26   device to ambulate.  Dr. Cabaluna found that Plaintiff could sit for six (6) hours in an eight (8) hour

27   workday but would need to alternate sitting and standing.  AR 304.  He found that Plaintiff could

28   frequently balance, stoop/bend, kneel, and climb ramps and stairs.  Plaintiff could occasionally crawl,

1    crouch/squat, and climb ladders and scaffolds.  AR 304.  Dr. Cabaluna stated that standard breaks and

2    lunch periods would provide sufficient relief to allow Plaintiff to work for eight (8) hours a day.  AR

3    305. These findings were consistent with the opinion that Plaintiff could perform activities at the

4    medium exertional level.

5            At the request of the Bureau of Disability Adjudication, Plaintiff also presented to Thomas

6    Towle, Ph.D., for a psychological evaluation on October 21, 2011.  AR 324-331.  Plaintiff reported that

7    she felt depressed off/on sometimes.  AR 325.  She also indicated that she suffered from significant

8    depression several years earlier when she lived in Alaska.  AR 331.  Dr. Towle diagnosed Plaintiff with

9    a mild depressive disorder that was secondary to somatic and associated pain concerns.  AR 331.  He

10   noted that Plaintiff was "likely capable of maintaining attention and concentration necessary to

11   understanding, remembering and carrying out detailed instructions and of interacting appropriately with

12   others." AR 330.  Dr. Towle found that Plaintiff's "[p]yschological prognosis was judged fair-good

13   with adequate disposition of somatic concerns."  AR 331.

14           A non-examining State agency medical consultant, Mayenne Karelitz, M.D., completed a

15   Physical Residual Functional Capacity Assessment form on November 3, 2011.  Dr. Karelitz found that

16   Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk for

17   about 6 hours in an 8-hour work day, and sit for about 6 hours in an 8-hour work day.  AR 333.  She

18   concluded that Plaintiff could frequently climb stairs/ramps, balance, stoop, and kneel and could

19   occasionally climb ladders/ropes/scaffolds, crouch, and crawl.  AR 334.  Dr. Karelitz found that

20   Plaintiff did not have any manipulative, visual, communicative, or environmental limitations.  AR 335-

21   336.  She stated that Plaintiff's "[a]lleged physical limitations [were] partially supported by MER in

22   file."  AR 337.  Dr. Karelitz's conclusions differed from Dr. Cabaluna, in that Dr. Karelitz found that

23   Plaintiff's work capacity decreased to a light work load.  AR 338.  She also found that the opinion of

24   Dr. Davey was "too restrictive and was not accompanied by actual objective exam findings."  AR 338.

25   Dr. Karelitz also noted that Plaintiff had a history of drug abuse.  AR 339.

26           Mark Richman, Ph.D. filled out a Psychiatric Review Technique form.  Dr. Richman found that

27   Plaintiff had a medically determinable impairment of depression, which was mild and secondary to

28   somatic and pain concerns.  AR 345.  He found this impairment to not be severe.  AR. 342.  He also

1   found that Plaintiff had an anxiety-related disorder and a substance addiction disorder.  AR 342.  In

2   regard to the substance addiction disorder, Dr. Richman noted that Plaintiff had a remote history of

3   polysubstance dependence but that she was in full remission.  AR 350.  He found that Plaintiff was

4   mildly limited in participating in activities of daily living, in maintaining social functioning, and in

5   maintaining concentration, persistence or pace.  AR 352.

6           **4.      Affidavit's of Plaintiff's Friends**

7           Plaintiff's friend Gertie Slack submitted a statement to support Plaintiff's application for

8   benefits dated November 13, 2012.  Ms. Slack had known Plaintiff since she moved to Nevada.  AR

9   208.  She saw Plaintiff many times a week and spoke with her almost everyday.  AR 210.  Ms. Slack

10  helped Plaintiff with her volunteer services at church which involved making cupcakes for the ladies

11  who had birthdays each month.  AR 208.  Ms. Slack observed Plaintiff "in lots of pain" but that

12  Plaintiff did not want to take drugs that could be addictive.  AR 209.  She stated that  "[m]any times

13  after making the cupcakes or a visit to the [Paiute] clinic [Plaintiff] would spend the next few days in

14  bed" because of great pain or to become extremely tired.  AR 209.  She noted that Plaintiff had been

15  slowly deteriorating since they first met and that despite the pain medication Plaintiff hurt all day.  AR

16  210.  Plaintiff was unable to continue with her craft work and was forgetting to eat breakfast due to loss

17  of appetite.  AR 210.  She stated that Plaintiff also suffered from blood sugar attacks during the day that

18  puts her back in bed.  AR 210.  Ms. Slack believed that Plaintiff was incapable of holding a job and her

19  only income was the generosity of her friends.  AR 210.  Further, Plaintiff's family was in no condition

20  to help her financially or giver her the love and support she needed.  AR 210-211.

21          Plaintiff's friend Cornelia Madsen submitted a statement in support of Plaintiff's application for

22  benefits.  Ms. Madsen allowed Plaintiff to reside in her home in Boulder City, Nevada.  AR 212.

23  Plaintiff did not pay rent but agreed to pay Ms. Madsen when she obtained an income.  Ms. Madsen

24  stated that she loved how well Plaintiff took care of her home and yard.  AR 212.

25          Plaintiff's friend Sandra La Montagne submitted an affidavit dated November 6, 2012.  Ms. La

26  Montagne had known Plaintiff since April 2011.  AR 213.  She talked to Plaintiff at least two to three

27  times a week on the phone and usually saw her about four to five times a week.  She knew Plaintiff

28  suffered from fibromyalgia and observed that Plaintiff was only as active as her body would allow her

to be.  AR 213.  In October 2011 Ms. La Montagne noticed that Plaintiff began to be easily fatigued.

Plaintiff told Ms. La Montagne that her pain level was increasing and that the pain medications were

not working as well.  AR 213.  Plaintiff was not sleeping well due to the pain and would wake up

soaking wet from sweating.  Ms. La Montagne stated that by January 2012 Plaintiff began to forget

things and would have to write everything down.  AR 213.  Plaintiff would forget to eat and "that made

her hypoglycemic and very ill."  AR 213.  Ms. La Montagne stated that when Plaintiff was too active

cleaning her house or working in her yard she would be in bed for the next three days recovering from

the pain and fatigue.  AR 214.  Ms. La Montagne helped Plaintiff care for her garden and another friend

would mow her lawn.  Ms. La Montagne noted that Plaintiff had deteriorated even more since August

2012.  Plaintiff was no longer as active and could not stand, sit, or walk for long periods of time.  AR

214.  When grocery shopping, Plaintiff always used the cart as a walker.  Ms. La Montagne stated that

Plaintiff's depression had become severe and that it was a factor in Plaintiff's inability to work.  Ms. La

Montagne believed that due to Plaintiff's "severe chronic pain, chronic fatigue, muscle weakness, and

depression" she was unable to work, either full-time or part-time, in any occupation.  AR 214.

### C.    ALJ's Decision

In his December 21, 2012 decision, the ALJ determined that Plaintiff was not disabled from

December 1, 2009, through the date of the decision because Plaintiff possessed the residual functional

capacity ("RFC") to perform work at the light exertional level as defined in the Dictionary of

Occupational Titles and the Social Security Regulations.  AR 22.  In reaching this conclusion, the ALJ

followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f).  First, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since the alleged amended onset date of

December 1, 2009.  AR 19.  Second, he found Plaintiff had severe impairments including "fibromyalgia

syndrome and obesity."  AR 19.  The ALJ noted that Plaintiff suffers from a left thumb trigger finger

but found that this condition had only a minimal effect on her ability to work and was not a severe

impairment.  AR 19.  The ALJ further noted that Plaintiff had a depressive disorder.  AR 20.  He found

that while this disorder could reasonably be expected to produce some symptoms, Plaintiff's statements

concerning the intensity, persistence, and limiting effects of her symptoms were not credible.  AR 21.

The ALJ stated that Plaintiff's medical history failed to demonstrate that her depression was severe

because on multiple occasions in 2012 Plaintiff indicated that she was in a "good mood" and was not

receiving psychiatric care, either in the form of therapy or medication.  AR 20-21.  Further, the ALJ

gave great weight to the opinions of consultative examiner, Mark Richman, Ph.D.  AR 20.  Dr.

Richman found that Plaintiff had a depressive disorder, but "did not identify more than mild difficulties

in the claimant's ability to perform the paragraph "B" criteria of the Listings."  AR 20.  The ALJ stated

that this opinion was reinforced by the opinion of Thomas Towle, Ph.D., who assessed Plaintiff "as

having a Global Assessment of Functioning of 65-70, indicative of no more than mild symptoms."  AR

20.  For these reasons, the ALJ found that Plaintiff did not have a severe mental impairment or related

symptoms.  AR 21.

      Third, the ALJ found that Plaintiff's impairments did not, individually or in combination, meet

the requirements of and were not medically equivalent to any condition listed in Appendix 1, Subpart P,

of 20 C.F.R. § 404.1520(c) and § 416.920(c).  AR 21.

      Prior to step four of the analysis, the ALJ found:

> [Plaintiff] has the residual functional capacity to perform work at the light
> exertional level as defined in the Dictionary of Occupational Titles and
> the Social Security Regulations.  Further, [Plaintiff] is able to frequently
> balance, stoop, kneel, and climb stairs/ramps. [Plaintiff] also is able to
> occasionally crouch, crawl, and climb ladders, ropes or scaffolds.

AR 22.

      The ALJ found that "the medical records do not reflect any substantial deterioration in

[Plaintiff's] medical condition as of her alleged onset date."  AR 22.  Plaintiff's medical records

demonstrated that her fibromyalgia was improving with proper medication and physical therapy

sessions.  AR 22-23.  The ALJ also noted that the majority of Plaintiff's symptoms in 2011 and 2012

that were consistent with fibromyalgia were point tenderness and trigger tenderness.  The ALJ stated

that Plaintiff was not observed exhibiting any other signs or symptoms generally associated with

fibromyalgia syndrome such as repeated manifestations of cognitive or memory problems, irritable

bowel syndrome, or waking unrefreshed.  AR 22-23.

      The ALJ summarized the findings of consultative examiner Dr. Wenceslao Cabaluna.  He noted

that Dr. Cabaluna found that Plaintiff had six (6) positive tender points but demonstrated normal

motion in her spine and all extremities.  AR 23.  Plaintiff's grip strength was normal, she walked with a

1   normal gait and there was no evidence of foot drop or shuffling.  Plaintiff could walk on her heels and

2   toes.  Her straight-leg raising was negative and she had no evidence of atrophy or fasciculations.  The

3   ALJ noted that Dr. Cabaluna found that Plaintiff retained the ability to perform "medium exertional

4   activities, as defined in the Social Security Regulations, which did not involve more than occasional

5   climbing of ladders or scaffolds, crouching or squatting, and crawling."  AR 23.  The ALJ gave this

6   opinion "substantial weight," because it was consistent with the objective medical evidence in the

7   record.  AR 24.

8        The ALJ discussed the opinion of Dr. Mayeene Karelitz, who found that Plaintiff "retained the

9   ability to perform light exertional activities."  AR 23.  The ALJ gave this opinion "greater weight," as it

10  was more consistent with the objective clinical evidence as well as statements that Plaintiff's symptoms

11  improved with the continued use of medications and therapy.  Dr. Karelitz's opinion was also consistent

12  with that of Dr. Cabaluna's.  AR 24.

13       The ALJ discussed the findings of Dr. Nicole Davey, Plaintiff's treating physician.  The ALJ

14  afforded Dr. Davey's opinion "little weight," because it was too restrictive.  The ALJ also stated that

15  Dr. Davey's opinion was not accompanied by objective findings and was based almost entirely on

16  Plaintiff's subjective complaints —which the ALJ believed lacked credibility.  AR 24.

17       The ALJ also discounted Plaintiff's credibility regarding the severity of her symptoms.  First,

18  the ALJ noted that despite Plaintiff's complaints of muscle pain and fatigue, she continued doing her

19  craft work, attending church, and visiting friends.  AR 24.  He stated that "the objective medical

20  evidence does not document findings consistent with complaints of disabling symptoms since

21  [Plaintiff's] alleged onset date."  AR 25.  Specifically, the ALJ stated that "there [were] no clinical

22  findings of significant sensory/motor deficits, diminished motion in multiple joints, disuse atrophy,

23  abnormalities of gait, or other physical abnormalities consistent with the extreme allegations of

24  [Plaintiff]."  AR 25.  The ALJ also pointed to inconsistent statements made by Plaintiff regarding her

25  prior illicit drug use.  He noted that Plaintiff told the consultative examiner that she had never engaged

26  in illegal substance abuse.  However, Plaintiff told her psychiatrist in June 2011 that she had a long

27  history of Methamphetamine, Cannabis, LSD, Cocaine, and other hallucinogen abuse.  AR 25.  The

28  ALJ noted that this inconsistency "completely diminished" Plaintiff's overall credibility.  The ALJ

16

1  noted that Plaintiff's testimony about her inability to sit and stand during an eight-hour workday was

2  inconsistent. He also stated that Plaintiff's testimony relating to her past work and her recorded

3  earnings were inconsistent. Specifically, Plaintiff testified that she worked full-time in 1997, however,

4  her reported yearly earnings were less than $400. AR 25. Finally, the ALJ stated that Plaintiff's failure

5  to continue with therapy, as well as other types of treatment, which had reportedly helped her improve,

6  lead him to doubt Plaintiff's allegations. AR 26.

7      The ALJ also discredited the statements of Plaintiff's friends. He noted that Plaintiff's friends

8  may have been inclined to endorse her application for disability benefits because of their personal

9  relationship. AR 25.

10     Based on his determination that Plaintiff had the residual functioning capacity to perform work

11 at the light exertional level, the ALJ concluded at step four that Plaintiff was able to perform her past

12 relevant work as an electronics tester and electronics inspector. AR 26. The ALJ noted that this

13 conclusion was consistent with the VE's testimony that an individual with Plaintiff's residual

14 functioning capacity could perform her past relevant work as an electronics tester and/or inspector. AR

15 26.

16                                        **DISCUSSION**

17      I.      **Standard of Review.**

18     A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's

19 findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal

20 standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841,

21 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla

22 but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

23 adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting

24 *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th

25 Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting

26 evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the

27 Commissioner of Social Security are supported by substantial evidence, the District Court must accept

28 them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one

                                             17

rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.* If the court determines that the ALJ's denial of benefits results from an improper rejection of Plaintiff's testimony regarding the severity of her symptoms, or a rejection of the opinion of the Plaintiff's treating physician(s), then the court must apply a three-part test to determine if the matter should be remanded for an award of benefits or for further proceedings. The court must decide whether:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *See also Varney v. Sec'y of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). Generally, when all of these conditions are met

18

the court must remand for an award of benefits. *Garrison*, 759 F.3d 1020–21. However, if an evaluation of the record as a whole would "creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," then remand for further proceedings is proper. *Id.*

## II.     Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)     he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)     the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). At the first step, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b). Second, the Commissioner determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id*. § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id*. §

1    416.920(e).  If the claimant can engage in past relevant work, then no disability exists.  *Id.* §

2    404.1520(e).  If the claimant cannot perform past relevant work, the Commissioner has the burden to

3    prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work.

4    *Id.* § 404.1520(f).  If the Commissioner cannot meet his or her burden, the claimant is entitled to

5    disability benefits.  *Id.* § 404.1520(a).

6    ### III.    Analysis of the Plaintiff's Alleged Disability

7        Plaintiff argues that the ALJ erred prior to or at step four of the sequential analysis by failing to

8    provide clear and convincing reasons for finding that Plaintiff was not credible, and in failing to

9    articulate legitimate reasons for rejecting the opinions of her treating physician.  The Ninth Circuit has

10   consistently held that "questions of credibility and resolution of conflicts in the testimony are functions

11   solely of the Secretary."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982); *see also Allen v.*

12   *Heckler*, 749 F.2d 577, 580 n.1 (9th Cir. 1985).  "The ALJ is responsible for determining credibility and

13   resolving conflicts in medical testimony."  *Magallenes,* 881 F.2d at 750.  However, the ALJ's

14   credibility findings must be supported by specific, cogent reasons.  *See Rahad v. Sullivan*, 903 F.2d

15   1229, 1231 (9th Cir. 1990); *see also Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir. 1988).  General

16   findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

17   undermines the claimant's complaints.  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995); *see also*

18   *Dodrill v. Shalala*, 12 F.2d 915, 918 (9th Cir. 1993).

19       In  *Molina v. Astrue*, 674 F.3d 1104, 1112-3 (9th Cir. 2011), the court further discusses the

20   credibility assessment as follows:

21              In assessing the credibility of a claimant's testimony regarding subjective
             pain or the intensity of symptoms, the ALJ engages in a two-step analysis.
22             *Vasquez v. Astrue,* 572 F. 3d 586, 591 ( 9th Cir. 2009).  First, the ALJ
             must determine whether there is "'objective medical evidence of an
23           underlying impairment which could reasonably be expected to produce
             the pain or other symptoms alleged.'"  *Id.* (quoting *Lingenfelter v. Astrue,*
24           504 F.3d 1028, 1036 (9th Cir.2007)).  If the claimant has presented such
             evidence, and there is no evidence of malingering, then the ALJ must
25           give "'specific, clear and convincing reasons'" in order to reject the
             claimant's testimony about the severity of the symptoms.  *Id.* (quoting
26           *Lingenfelter,* 504 F.3d at 1036).  At the same time, the ALJ is not
             "required to believe every allegation of disabling pain, or else disability
27           benefits would be available for the asking, a result plainly contrary to 42
             U.S.C. § 423(d)(5)(A)."  *Fair v. Bowen,* 885 F.2d 597, 603 (9th
28           Cir.1989).  In evaluating the claimant's testimony, the ALJ may use

"'ordinary techniques of credibility evaluation.'" *Turner,* 613 F.3d at 1224 n. 3 (quoting *Smolen,* 80 F.3d at 1284). For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment,'" *Tommasetti,* 533 F.3d at 1039 (quoting *Smolen,* 80 F.3d at 1284); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter,* 504 F.3d at 1040. While a claimant need not "'vegetate in a dark room'" in order to be eligible for benefits, *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987) (quoting *Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981)), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir.1999); *Fair,* 885 F.2d at 603. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner,* 613 F.3d at 1225; *Valentine,* 574 F.3d at 693.

Under the first prong, the ALJ found that Plaintiff's "medically determinable impairment could reasonably be expected to produce some symptoms." AR 25. In rejecting Plaintiff's credibility under the second prong, the ALJ focused on the fact that Plaintiff did not display some symptoms commonly associated with fibromyalgia, such as cognitive or memory problems, irritable bowel syndrome, disuse atrophy, abnormalities of gait, diminished motion in multiple joints, or waking unrefreshed. AR 22-25. While the medical records do not indicate that Plaintiff suffered from these symptoms, the ALJ failed to address the symptoms she did display. According to Social Securtiy Ruling 12-2p, symptoms of fibromyalgia include:

> [M]uscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

2012 SSR LEXIS 1 at *9.

Other conditions that may be considered in finding a medically determinable impairment of fibromyalgia include:

> [I]rritable bowel syndrome or depression (. . .), anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis,

21

temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome.

*Id.* at *10.

The medical records show that Plaintiff suffered from depression secondary to her fibromyalgia. AR 331, 345. She complained of constant and severe fatigue, muscle and joint pain, and numbness. *See generally* AR 222-265. Plaintiff also suffered from insomnia and was prescribed Ambien to help her sleep. AR 402. Plaintiff was diagnosed with dyspepsia, which includes symptoms of nausea and loss of appetite.[2] AR 409. Moreover, Plaintiff complained of blurry vision. AR 405. Thus, the ALJ's reliance of Plaintiff lack of symptoms consistent with fibromyalgia is unpersuasive because he failed to consider all of Plaintiff's complaints and symptoms as reported in her medical records.

The ALJ improperly isolated or emphasized excerpts from the record to find that Plaintiff lacked credibility. The ALJ noted that from the alleged onset date, Plaintiff reported improvement with certain medications. AR 22-26. The records show, however, that these improvements were generally characterized as "mild" or "moderate" and did not alleviate Plaintiff's symptoms. AR 315, 392. Plaintiff testified at the hearing that the medications "take the edge off" and that "[t]hey don't make [her] want to sleep all the time." AR 38, 45. The ALJ's reasons for questioning Plaintiff's credibility in this instance was only partly valid.

The ALJ also discounted Plaintiff's credibility due to the fact that she discontinued her physical therapy which had reportedly helped her. AR 26. Plaintiff testified, however, that she stopped going to physical therapy because the hour long drive home was very uncomfortable and she felt that the benefits she received from therapy were not worth the additional pain from the drive. AR 45. While Plaintiff's failure to pursue recommended therapy raises a legitimate question, Plaintiff provided a reasonable explanation for not doing so which the ALJ failed to address. The ALJ also found that Plaintiff's testimony was inconsistent with her ability to perform various activities, such as craft work, attending church every week, grocery shopping, and visiting her friends. AR 24. These limited activities, however, do not contradict Plaintiff's assertions of severe pain and/or restrictions. The Ninth Circuit

---

[2] *See* http://www.webmd.com/digestive-disorders/tc/dyspepsia-topic-overview.

22

1   has stated that "the mere fact that a plaintiff has carried on certain daily activities, such as grocery

2   shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility

3   as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) .

4          Finally, the ALJ questioned Plaintiff's credibility because of inconsistent statements in the

5   record.  First, the ALJ stated that Plaintiff failed to disclose to the consultative examiner, Dr. Cabaluna,

6   that she had engaged in prior illegal substance abuse.  AR 25.  Second, Plaintiff made inconsistent

7   statements about her ability to stand, walk, and sit during a typical work day.  The ALJ stated that the

8   discrepancy between Plaintiff's testimony of her past work and her recorded earnings reflected

9   negatively on her credibility.  AR 25.  The ALJ has "a special duty to develop the record fully and fairly

10  and to ensure that the claimant's interests are considered." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th

11  Cir. 2001) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)).  Because the claimant

12  bears the burden of proving disability, the ALJ's duty to further develop the record is "triggered only

13  when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of

14  the evidence." *Tonapetyan*, 242 F.3d at 1150.  Once a perceived inconsistency between the written

15  record and the oral testimony arises, the ALJ must confront the claimant with the inconsistency and

16  address any explanation made.  *See Soto-Olarte v. Holder*, 555 F.3d 1089 (9th Cir. 2009).

17         The ALJ did not confront Plaintiff with her failure to disclose her prior illegal substance abuse

18  to Dr. Cabaluna.  The record also shows that Plaintiff did disclose her prior drug use to Dr. Thomas

19  Towle during her October 2011 psychological evaluation.  AR 327.  The implication that Plaintiff was

20  untruthful about her prior drug use is therefore without merit. The ALJ did provide Plaintiff with the

21  opportunity to explain her ability or inability to sit, stand, and walk during a normal work day.  He also

22  asked Plaintiff about the discrepancy between her work history and reported earnings.  These

23  discrepancies in Plaintiff's testimony appear minor, however, and of the type that an otherwise truthful

24  and credible person could reasonably make.  Only a few of the reasons relied on by the ALJ for

25  rejecting Plaintiff's credibility were valid.  In view of the record as a whole, the ALJ failed to provide

26  clear and convincing reasons to reject the credibility of Plaintiff's statements and testimony regarding

27  . . .

28  . . .

23

1   the severity of her symptoms.[3]

2       Plaintiff also argues that the ALJ erred by giving only limited weight to the opinion of her

3   treating physician, Dr. Nicole Davey, and by giving greater weight to the functional capacity assessment

4   of non-examining State agency medical consultant, Dr. Mayeene Karelitz.  Dr. Karelitz opined that

5   Plaintiff retained the ability to perform light exertional activities as defined by the Social Security

6   Regulations.

7       It is the responsibility of the ALJ to determine residual functional capacity.  *Vertigan v. Halter*,

8   260 F.3d 1044, 1049 (9th Cir. 2001); 20 C.F.R.  §§ 404.1546(c) and 416.946(c).  In making that

9   determination, the ALJ must consider all of the medical evidence in the record, including the opinions

10  of treating, examining or reviewing or consulting physicians.  The Social Security Administration

11  (SSA) generally gives more weight to the opinions of a treating physician than to those of an examining

12  or reviewing physician.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(1);  *Lester v. Chater*, 81 F.3d 821,

13  830 (9th Cir. 1996).  Likewise, the opinion of a physician who has examined the claimant is generally

14  given more weight than the opinion of a physician who has not examined the claimant.  20 C.F.R. §§

15  404.1527(c)(1) and 416.927(c)(1).  *Lester v. Chater* states that "the opinion of an examining doctor,

16  even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are

17  supported by substantial evidence in the record."  *Id.*, 81 F.3d at 8301-22.  The court has also stated that

18  _____

19      [3]The ALJ also accorded little weight to the statements of Plaintiff's friends regarding the severity of her
symptoms.  "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony
20  concerning a claimant's ability to work." *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th
Cir.2006).  The Ninth Circuit has made clear that this includes testimony from friends and family members.
21  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993) ("friends and family members in a position to observe a
claimant's symptoms and daily activities are competent to testify as to [a claimant's] condition.").  "Disregard of
22  this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to
how an impairment affects a claimant's ability to work." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir.1987);
23  *see* 20 C.F.R. § 404.1513(d)(4).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment
affects ability to work is competent evidence ... and therefore cannot be disregarded without comment." *Stout*,
24  454 F.3d at 1053 (emphasis in original).  An ALJ can reject the testimony of a lay witness only if he gives
reasons germane to each witness whose testimony he rejects. *Dodrill*, 12 F.3d at 919.  The ALJ summarily
25  rejected the statements of Plaintiff's friends because they "may have incentive to endorse her application for
disability benefits due to their personal relationship with the claimant."  AR 25.  This wholesale dismissal of their
26  statements does not qualify as germane reasons.  Otherwise, the testimony of any friend or relative would be
subject to automatic rejection.

27

28

1    "[a]lthough the contrary opinion of a non-examining medical expert does not alone constitute a specific,

2    legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial

3    evidence when it is consistent with other independent evidence in the record." *Tonapetyan v. Halter*,

4    242 F.3d 1144, 1149 (9th Cir. 2001), citing *Magallanes v. Bowen*, 881 F.2d at 752.  An examining or

5    reviewing physician's contrary opinion, without more, however, does not constitute substantial

6    evidence that would justify rejection of the treating physician's opinion.  *See Pitzer v. Sullivan*, 908

7    F.2d 502, 506 n.4 (9th Cir. 1990).

8        The ALJ rejected Dr. Davey's opinion on the grounds that it was too restrictive and was largely

9    based on Plaintiff's subjective complaints.  AR 24.  He failed, however, to articulate a reasonable basis

10   for that conclusion.  As Plaintiff argues, fibromyalgia is a common, but elusive and mysterious disease,

11   whose causes are unknown and whose symptoms are largely subjective.  *Sarchet v. Chater*, 78 F.3d

12   305, 306 (7th Cir. 1996).  *See also Kullman v. Colvin*, 2014 WL 542974, *6 (M.D.Fla. February 11,

13   2014); and Social Security Ruling 12-2p.  Dr. Davey was one of Plaintiff's treating physicians who,

14   along with other physicians at UMC, saw and examined Plaintiff on a frequent basis and found that her

15   subjective complaints were consistent with a diagnosis of fibromyalgia.  AR360-410.  Dr. Davey further

16   stated that her residual functional capacity assessment of Plaintiff was based on "clinical evidence."

17   AR 321.  The statements of the other treating and examining physicians supported Dr. Davey's findings

18   and opinions regarding Plaintiff's fibromyalgia and her associated symptoms.  Dr. Shetty, for example,

19   stated that Plaintiff's "clinical condition, clinical symptoms as well as negative serological evidence is

20   consistent with fibromyalgia."  AR 393.  Dr. Cabaluna and Dr. Karewitz both found that Plaintiff

21   suffered from fibromyalgia. The only difference between their assessments and Dr. Davey's was the

22   degree to which Plaintiff's symptoms limited her functional capacity.  Dr. Cabaluna found that Plaintiff

23   could perform activities at the medium exertion level.  Dr. Karelitz found that Plaintiff could perform

24   activities at the light exertional level.  Dr. Davey found, however, that Plaintiff was unable to perform

25   work even at the sedentary level.

26       Besides the assertion that Dr. Davey's opinion was not based on objective medical findings, the

27   ALJ's rejection of Plaintiff's credibility was the linchpin to his rejection of Dr. Davey's opinions.  As

28   discussed above, however, the ALJ erred in rejecting Plaintiff's credibility.  He therefore also erred in

1    rejecting Dr. Davey's reliance on Plaintiff's descriptions of the severity of her symptoms.

2        The ALJ's December 21, 2012 decision did not provide legitimate reasons, supported by

3    substantial evidence in the record, to reject Dr. Davey's assessment of Plaintiff's functional capacity.  If

4    accepted as true or valid, Dr. Davey's opinion supports a finding of disability.  In this regard, the

5    vocational expert testified that a person who could only sit for a total of two hours throughout an eight-

6    hour day and stand/walk for 40 minutes at a time, or two hours total in an eight-hour work day, is

7    incapable of performing past relevant or competitive work at the sedentary level.

8                                         **CONCLUSION**

9        Based on the foregoing, the Court concludes that the ALJ erred in denying Plaintiff's application

10   for disability benefits based on his improper rejection of her statements and testimony regarding the

11   severity of her symptoms, and his rejection of the opinions of her treating physician that she does not

12   have the residual functional capacity to perform work even at the sedentary level.  In accordance with

13   the three part test set forth in *Garrison v. Colvin*, 759 F.3d at 1020, the Court further finds that (1) the

14   record has been fully developed and further administrative proceedings would serve no useful purpose;

15   (2) the ALJ failed to provide legally sufficient reasons to reject the testimony of Plaintiff, her friends,

16   and her treating physician, and (3) if the improperly discredited evidence were credited as true, the ALJ

17   would be required to find disability on remand.  There is also no serious doubt on this record as to

18   whether the Plaintiff is disabled.  Accordingly,

19                                      **RECOMMENDATION**

20       **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#16) be

21   **granted** and that this case be remanded to the Commissioner of Social Security for an award of

22   disability benefits.

23       **IT IS FURTHER RECOMMENDED** that Defendant's Cross Motion to Affirm (#17) be

24   **denied**.

25                                         **NOTICE**

26       Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing

27   and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the

28   failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure

to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 16th day of March, 2016.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

27